The opinion of the court was delivered by
Manning, C. J.
The plaintiffs seek in this petitory action to recover-certain lands, as heirs of their father and mother. The defendant pleads res adjudicata, basing the plea upon a judgment rendered in a suit, wherein the mother was plaintiff, in the several capacities of executrix of her husband, of widow in community, and of legatee of her husband of the same land, and the defendant in that suit being- the defendant in this, other defences are made, and among them is prescription.
John Sharkey, the father of the plaintiffs, died the owner of the-land, which was sold under order of the court of proper jurisdiction to pay his and his succession’s debts, and was then bought by the defendant at its appraised value. The price was paid cash, and was appropri *892 ated to the payment of the debts as directed in the mortuary proceedings. The process of monition was afterwards obtained by the defendant, and the sale was approved and confirmed. He then expended a large sum, $12,000, in improvements upon the land, the purchase price of which was only $2,500, and in this suit called Bach, who was the executor of Sharkey, in warranty. The alleged warrantor pleaded the sale under order of the court, the disbursement of the price among Sharkey’s creditors, and his discharge by the court upon an account duly rendered of his gestión as executor.
The jury found for the plaintiffs against the defendant, awarding the land and improvements to them,-and for the defendant against the warrantor for $2,500. From a judgment in accordance with this verdict, the defendant and the -warrantor appeal.
The judgment pleaded as res adjuclicata was rendered in a suit instituted in the district court of Washington parish. At the December term 1868 of that Court, being unable to try the cause for want of time, all the parties agreed to take it over to St. Helena parish-, where the district judge had to go to hold his court for that parish, and there try it. This was done. The cause was not transferred. It was heard as agreed on, and the judgment was sent, with the record, back to Washington parish, and at a subsequent term of that court, the judgment was ■signed in open court and was entered on the minutes of that court. We discover neither irregularity, nor other objection to this proceeding, -which was mutually agreed to and desired by all the parties. Rust v. Faust, 15 Annual, 477.
Mrs. Sharkey was plaintiff in that suit as widow in community, and the judgment rendered therein concluded her rights to her moiety of ■the land, and as to that moiety, the plaintiffs, who derive title from her, are also concluded. Her additional capacity of legatee of the land under the husband’s will, in which she also sued, would seem to have the same effect as to the other half, in the absence of any suit or allegation by his heirs that the property thus bequeathed exceeded the disposable portion, and in the absence of any proof that the will had ever been attacked, or annulled, quoad that bequest.
But the sale provoked by Bach, executor, is attacked as null for want of representative character in him. He was not dative executor of 'Sharkey’s will, it is said, because Mrs. Sharkey, the testamentary execu•trix, was the proper and legal representative of the succession.
Sharkey died in March 1862, or his will was then probated; and his widow qualified under it as executrix. A few weeks thereafter, the city of New Orleans was captured by the naval forces of the United States, ■and the circumjacent territory fell under the military domination of that ■Government. The parish of Washington remained under the control of *893 the Confederate States. Its courts, officers, etc. continued to perform their functions as before. That the official acts of civil officers, performed within and. upon a territorial area, possessed, held, and controlled by a government, as this was by the Confederate States, are valid and legally binding, is an unquestioned principle in the law- of nations, and has never been denied by publicists. So long as a government exercises sway over a territory, and has the physical power and means to enforce obedience, the civil acts of its officers are validated from considerations of public policy and international interest, and the highest court of the United States has enforced this rule against itself. U. S. v. Rice, 4 Wheat. 246. Lay v. O’Neil, 29 Annual, 722.
Mrs. Sharkey abandoned her home in Washington parish, and went to New Orleans, and there remained, and became subject to the laws, and to the military control, of the Power then supreme there. Her oath of allegiance to that Power was taken. In June 1868 an act was passed by the legislature declaring all offices vacant, whose incumbents had taken that oath after January 1861. Acts 1863, p. 11. Mrs. Sharkey’s office of executrix was alleged thus to be vacated, but was not filled until 1866, when Bach was appointed dative executor of the will of her husband. Manifestly, she could not then longer perform its functions. Legally she was an enemy to the government that alone discharged the duties of a government at and over the place where the succession was administered. Yattel, 399. Woolsey, Intern. Law, $ 117.
It is said however that her office was never judicially declared vacant, and if it were, there is no proper proof of it. The plaintiff himself, moved by what ho then deemed a patriotic zeal, actually instituted suit to destitute Mrs. Sharkey of her office in October 1864, on the grounds that her sworn allegiance to another and a hostile government prevented her from performing any legal functions, and Mrs. Sharkey was present there during 'that proceeding, and knew of its pendency. A judgment was entered as the plaintiff prayed — he who was plaintiff then being plaintiff now. In May 1866, Mrs. Sharkey, by petition to the circuit court of the United States in New Orleans, alleged that on Oct. 24,1864 James Sharkey obtained a judgment against her, removing her as testamentary executrix, and that latterly Bach had been appointed, and praying to be reinstated. She did not obtain the desired judgment, and never afterwards attacked Bach’s title.
The defendant could not produce the copy of the original judgment of destitution, because it could not be found, but he proved that in December 1864, a body of cavalry made a raid in that locality, and destroyed or mutilated the records of the courts, and tore and scattered the papers taken out of the different offices for miles on their retreat. The loss or absence of the paper was thus accounted for.
*894 If all other defences fail, the defendant holds the impregnable position which our law, and the general principles of equity, alike sustain, viz that where money paid for the property of a decedent has been used to pay his debts, his heir can not reclaim the property without first pay-, ing back, or tendering, the sum thus beneficially used to extinguish the ancestor’s obligation. This principle is not new to our jurisprudence. •Our earliest sages consecrated it, and we have already availed ourselves of a fitting opportunity to re-affirm and proclaim it anew. Daquin v. Coiron, 6 New Series, 675. Andrews v. Ackerson, 8 New Series, 205. Elliott v. Labarre, 3 La. 541. Foutelet v. Murrell, 9 La. 299. Brown v. Buony, ante, 175. Beauregard v. Leveau, ante, 302.
The verdict of the jury ignored this sound principle of ethics and of law, and the judgment upon that verdict is erroneous. Therefore
It is ordered, and decreed that the verdict of the jury is set aside, the judgment of the lower court is avoided and reversed, and that the appellants do now have judgment against the plaintiffs upon their demand, and for the costs of the lower court and of appeal.
Mr. Justice Marr took no part in the decision of this cause.